UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RONALD ALLEN,

                    Petitioner,                Case No. 2:17-cv-11170
                                             Hon. Arthur J. Tarnow

v.

LORI GIDLEY,

                    Respondent.

_____/

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY, AND GRANTING PERMISSION TO APPEAL IN FORMA PAUPERIS**

Petitioner Ronald Allen filed this application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner was convicted after a jury trial in the Jackson Circuit Court to two counts of possession with intent to deliver less than 50 grams of a controlled substance - second or subsequent offense, MICH. COMP. LAWS § 333.7401(2)(a)(iv) and MICH. COMP. LAWS § 333.7413(2); and one count of possession of marijuana, MICH. COMP. LAWS § 333.7403(2)(d). He was sentenced as a fourth-time habitual felony offender to 30 to 480 months' imprisonment for each of his possession with intent to deliver convictions, and one year's imprisonment for his possession of marijuana conviction.

The petition raises three claims: (1) the trial court erroneously allowed admission to DNA evidence connecting Petitioner to the coat where illegal narcotics were found, (2) Petitioner's trial counsel was ineffective for failing to challenge the

admissibility of the DNA evidence, and (3) Petitioner's trial counsel was ineffective for failing to object to the admission of other evidence at trial. The Court will deny the petition because the claims are without merit. The Court will also deny Petitioner a certificate of appealability, but it will grant him permission to proceed on appeal in forma pauperis.

## I. Background

This Court recites verbatim the relevant facts relied upon by the Michigan Court of Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). See *Wagner v. Smith*, 581 F.3d 410, 413 (6th Cir. 2009):

> This appeal arises out of an incident wherein drugs were found inside a coat that was located near defendant. On February 1, 2014, Renay Smith was working as the bartender at Keeder's Show Bar in Jackson, Michigan. According to Smith, defendant arrived at the bar sometime between 9:00 p.m. and 9:30 p.m., ordered a beer, and began playing pool with an unidentified woman. Smith further testified that she did not see any other men shooting pool or at the table when defendant arrived and began playing and that, when she saw him at the bar, defendant was wearing a white t-shirt and no coat.

> Shortly thereafter, City of Jackson Police Officers Rick Burkhart and Jason Ganzhorn received a notification on the computers in their patrol vehicles that defendant was on parole and at Keeder's, which was a violation of his parole because Keeder's served alcohol. In separate patrol vehicles, Burkhart and Ganzhorn drove to the bar and arrived sometime between 9:45 p.m. and 9:50 p.m. Before entering the bar, Ganzhorn and Burkhart pulled up a picture of defendant on their computers to familiarize themselves with him. Burkhart testified that, when he entered the bar, he saw defendant and a woman standing at the end of the pool table. According to Burkhart, other than the woman and defendant, there was no one else in close proximity to the pool

table at that time. Burkhart testified that, from his computer, he learned that defendant's nickname was "Blood." Thus, Burkhart said, "Blood," and defendant responded, "How do you know my name?" Burkhart testified that he asked defendant to put his pool stick down so that they could talk. According to Burkhart, there was a table within approximately three feet of defendant, and there was a beer, a set of eyeglasses, and a cellular telephone on the table. Burkhart testified that the table had a chair pushed in with a black coat hanging on the chair. Burkhart further testified that he then obtained consent to search defendant's pockets.

In the meantime, Ganzhorn walked in on the main level and observed Burkhart searching defendant on the upper level. Ganzhorn then went to the upper level to assist Burkhart. Burkhart testified that defendant had a large quantity of money in both of the back pockets of his pants, not carried in a money clip or a wallet. Burkhart did not find any weapons or contraband on defendant, but Ganzhorn and Burkhart determined that defendant was in violation of his parole. Ganzhorn testified that he began to place handcuffs on defendant and that defendant indicated that he was getting sick and began to pull toward the door. Burkhart testified that defendant was "basically dragging" him and Ganzhorn toward the door and that they had to tell defendant to hold on several times. Burkhart further testified that defendant was saying that he had high blood pressure and felt sick. According to Burkhart, he did not notice any signs of medical distress when he first approached defendant, and defendant seemed to be fine when he was playing pool. According to Ganzhorn, he and Burkhart ultimately walked defendant outside, and defendant started making dry heaving sounds and bending over at the waist. Burkhart testified that, while they were outside, Smith stuck her head out the door and asked what to do with defendant's belongings. Burkhart further testified that he went back inside the bar with Smith, who directed Burkhart to the table with the beer, eyeglasses, cellular telephone, and coat.

Burkhart went over to the table and searched the coat, which was size four XL. According to Burkhart, he found two knotted plastic bags, which contained marijuana, heroin, crack cocaine, and prescription pills, in the left chest pocket of the coat. Burkhart testified that he put the bags back in the coat pocket and went back outside to ask if

defendant wanted his coat. Defendant said that he did not have a coat. According to Ganzhorn and Burkhart, it was snowy and cold out that night. Burkhart testified that he placed the coat in the trunk of his vehicle after notifying Ganzhorn of what was in the coat. According to Burkhart, he then assisted placing defendant into Burkhart's vehicle. Burkhart testified that he monitored defendant while Ganzhorn went back into the bar. Ganzhorn testified that he "inquired about the black jacket and asked anyone inside the bar if it was their black jacket." He testified that "[e]veryone stated 'no.' " He further testified that he only recalled one male being inside the bar other than defendant and that the male was approximately 5 foot 6 inches and approximately 170 pounds. Ganzhorn testified that, when he came back outside, defendant indicated that the cellular telephone found on the table was his. Burkhart called an ambulance for defendant when Ganzhorn came back outside. Because there was a lot of snow on the ground that night, Ganzhorn and Burkhart eventually decided to transport defendant to the hospital themselves instead of waiting for an ambulance.

Burkhart drove defendant from the bar to the hospital, and Ganzhorn also drove his vehicle to the hospital. According to Burkhart and Ganzhorn, defendant was in the emergency room for approximately one and a half hours. Ganzhorn testified that defendant was administered medicine and that hospital personnel checked on defendant multiple times and checked defendant's blood pressure. Burkhart testified that defendant was never admitted as a patient and that, after the hour and a half, medical personnel gave Burkhart and Ganzhorn medical clearance for defendant, in the form of a signed piece of paper indicating that defendant did not need further medical treatment.

Subsequently, Ganzhorn transported defendant to Jackson County Jail. After defendant was taken to jail, Ganzhorn took the evidence back to the police department. Ganzhorn testified that one of the bags found in the coat contained marijuana, while the other contained 20 individually wrapped rocks of crack cocaine, an additional rock that was not individually wrapped, two bags of heroin, and miscellaneous pills. Ganzhorn testified that he field tested one of the rocks and that it tested positive for cocaine. Ganzhorn further testified that he field tested the heroin and that it also tested positive.

An additional $360 was found on defendant at the jail. Ganzhorn testified that the total amount of money found on defendant was $880, which consisted of all 20-dollar bills, except for one 100-dollar bill. Ganzhorn testified that no drug paraphernalia such as syringes, pipes, or rolling papers were found on defendant.

Defendant was eventually charged as described above. At trial, the prosecution presented the evidence summarized above through the testimony of Smith, Burkhart, and Ganzhorn. In addition, the prosecution presented expert testimony. Christy Sekedat, who worked for the Michigan State Police Forensic Laboratory and who was qualified as an expert in controlled substances identification, testified that she analyzed a sample of the suspected crack rocks and that it tested positive for cocaine. Sekedat further testified that she analyzed a sample of the suspected heroin, which also came back positive.

Gary Schuette, a detective for the City of Jackson Police Department, was qualified as an expert in street-level drug sales and dealing. He opined that the suspected marijuana was, in fact, marijuana. Schuette also testified about his experience with street-level drug dealing and described the typical dealing methods and the general differences between drug dealers and drug users:

> [T]ypically street-level drug dealers want to separate themselves from the drugs that they're selling. This is done so that they can remain anonymous if the drugs are found and they can claim distance from them. So, for instance, a street-level drug dealer will often take his cocaine or his heroin, his marijuana, whatever the case may be, place it into a Doritos bag, for instance, and wad it up and throw it into a bush which is in proximity to him, that he can access if he needs to, but he can walk away from it in case the police come up because it's such a visible occupation, where the police have the opportunity to sit back and surveille them and see what they're doing. But, if they keep themselves distant from the drugs, then they can say that's really not mine. That it's just trash, somebody threw it there. And it's easy for them to avoid being charged criminally with the drugs themselves.

> Users, on the other hand, because they're using the drug
> itself, want it close to them because they're going to use
> it. They don't want to be separated from the drugs.

Schuette further testified that it was very common, in his experience, to see someone distancing himself or herself from the drug that they are selling. According to Schuette, the amount and denominations of money, the lack of drug paraphernalia, and the quantity, packaging, and variety of drugs were indicative of someone who was selling the drugs rather than using the drugs.

Lisa Champion, a forensic scientist for the Michigan State Police, was qualified as an expert in serology and DNA analysis. She testified that she received a buccal swab sample from defendant and the coat. Champion testified that she obtained a mixture profile of DNA from swabbing the collar and cuffs of the coat. According to Champion, when she compared the major donor profile from the coat to defendant's buccal swab, the DNA matched "at all locations except for two," and defendant could not be excluded as a donor from those two locations. Accordingly, Champion testified that the probability that one would randomly select an unrelated individual from the population and have their profile match the profile from the coat was 1 in 2.502 quadrillion for the Caucasian population, 1 in 26.2 quadrillion for the African-American population, and 1 in 5.519 quadrillion for the Hispanic population. However, Champion indicated that it was possible for someone to leave their DNA on the coat by picking it up off the pool table or helping someone take off the coat.

After the prosecution's case-in-chief, defendant, through a stipulation with the prosecution, submitted defendant's medical records into evidence, "which include[d] his blood pressure levels . . . his discharge papers and the Emergency Room records of that." Defendant published the exhibit to the jury and stated that it indicated that his blood pressure levels "started very high and were reduced with medication over time." Defendant then rested.

During closing arguments, the prosecution argued that defendant's attempt to get outside "may or may not have been about a medical issue," that one's blood pressure could spike right before they are arrested with that many drugs, and that defendant may have been

trying to pull the officers away from the drugs in the coat. The prosecution further argued that the coat was at the table with defendant's belongings, that it did not make sense for him to be without a coat on a cold and snowy night, and that defendant's DNA connected him to the coat. In addition, the prosecution argued that the money, packing of the drugs, and lack of drug paraphernalia indicated that the drugs were meant for sale. In response, defendant argued that the coat was too big for him because it was a "four XL," that he was having legitimate medical issues when the police arrived, and that his DNA on the coat did not mean that the coat was his. Defendant further argued that someone's DNA could be present on the coat if they picked it up off the pool table or helped someone with taking off the coat. Defendant concluded by arguing that there were no fingerprints on the bags and that the prosecution had not proven its case beyond a reasonable doubt.

*People v. Allen*, No. 324442, *1-4 (Mich. Ct. App. Feb. 9, 2016).

Following his conviction and sentence, Petitioner filed an appeal of right. His appointed appellate counsel filed a brief on appeal that raised a claim of ineffective assistance of trial counsel supported by three allegations:

I. Mr. Allen's federal and state constitutional rights to the effective assistance of counsel were violated and he is entitled to a new trial.

A. Trial counsel rendered ineffective assistance in failing to object to damaging inadmissible testimony from a police officer.

B. Trial counsel rendered ineffective assistance in eliciting damaging testimony from a police officer, who was expert in the local drug trade, that he knew of Mr. Allen from his work.

C. Trial counsel rendered ineffective assistance in failing to request the curative instruction that the prosecutor had proffered should be given in regard to how the evidence that Mr. Allen was on parole could and could not be used by the jury.

This claim now forms Petitioner's third habeas claim.

Petitioner also filed his own pro se supplemental brief in the Michigan Court of Appeals, raising an additional two claims:

> I. Did scientific evidence conducted and determined by the analyst fall short of certainty?

> II. Did counsel error as a constructive denial rather that ineffective assistance impair preparation or presentation of a defense?

These now form Petitioner's first and second habeas claims. The Michigan Court of Appeals affirmed Petitioner's conviction in an unpublished opinion. *Id.* Petitioner filed an application for leave to appeal in the Michigan Supreme Court, raising the same claims. The application was denied because the court was not persuaded that the questions should be reviewed. *People v. Allen*, 882 N.W.2d 135 (Mich. 2016)(Table).

## II. Standard of Review

This habeas petition is reviewed under the standards set forth in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). Under AEDPA, a federal court cannot grant habeas relief with respect to any claim adjudicated on the merits in a state-court proceeding unless the state adjudication of the claim either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State

court proceeding. 28 U.S.C. § 2254(d)(1), (2).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). "[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86 (2011), (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for

fairminded disagreement." *Id*. at 786-87 (internal quotation omitted).

To obtain relief under § 2254(d)(2), a petitioner must show an unreasonable determination of fact and that the resulting state court decision was "based on" that unreasonable determination. *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2012).

### III. Discussion

A. Procedural Default

Respondent contends that all of Petitioner's claims are procedurally defaulted because of his failure to preserve his claims in the trial court and due to the incomplete manner he presented them to the Michigan Court of Appeals. Under the procedural default doctrine, a federal habeas court will not review a question of federal law if a state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment. See *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). However, procedural default is not a jurisdictional bar to review of a habeas petition on the merits. See *Trest v. Cain*, 522 U.S. 87, 89 (1997). Additionally, "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F. 3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). It may be more economical for the habeas court to simply review the merits of the petitioner's claims, "for example, if it were  easily resolvable against the habeas petitioner, whereas the procedural-bar

issue involved complicated issues of state law." *Lambrix*, 520 U.S. at 525. In the present case the Court deems it more efficient to proceed directly to the merits because the claims are more easily resolved on that basis, and because Petitioner claims that his attorneys were at fault for any procedural defaults.

B. Admissibility of DNA Evidence

Petitioner's first claim asserts that his trial was rendered fundamentally unfair in violation of due process by the admission of expert testimony that the DNA evidence found on the coat was identified with Petitioner's known DNA sample. He asserts that the expert testified as to the results of her testing without first testifying to the methodology she employed to demonstrate scientific reliability. He also objects to the expert's use of the "product rule method" of statistical analysis to conclude that Petitioner could not be excluded as the source of DNA found on the coat.

After reciting the law governing the admissibility of expert testimony under Michigan Rule of Evidence 702 and 403, the Michigan Court of Appeals denied the claim as follows:

> Here, the DNA expert testified regarding the statistical significance of the DNA match, which provided the jury meaningful assistance in determining whether defendant's DNA was part of the mixed sample. See *id.* at 301. Moreover, she testified extensively about her qualifications and the standards and procedures that were used in analyzing the DNA. Defendant argues that the standard of reliability was not met because the DNA evidence only showed that he could not be excluded and because "the prosecution introduce[d] DNA evidence

through the use of probability statistics," which were calculated using the product rule method. First, defendant's argument appears to be based on a misunderstanding of the facts. The DNA expert testified that "at all but two of the locations on the mixture," defendant's DNA was a match, and he could not be excluded as a donor from those other two locations. Second, pursuant to *Coy*, the prosecution was required to introduce interpretative statistical evidence to accompany the DNA match. Further, in *Coy*, 243 Mich. App. at 296 n. 7, this Court stated that it "has recognized the general acceptance within the scientific community of DNA statistical analysis evidence calculated utilizing the product rule, and judicially noticed the admissibility of these DNA statistical analyses." (Quotation marks and citation omitted). Thus, defendant has not shown plain error with respect to the admission of the DNA evidence under MRE 702. *Carines*, 460 Mich. 750, 762-765.

Further, with respect to MRE 403, the DNA expert's testimony was accompanied by interpretative statistical evidence, and the probability of selecting an unrelated individual who could be included as a contributor to the mixture exceeded the population on earth. With the accompanying statistics, the DNA was highly probative to possession of the coat and did not run the risk of being given undue or preemptive weight. Cf. *Coy*, 243 Mich. App. at 302. Defendant has not shown plain error with respect to the admission of the DNA evidence under MRE 403. *Carines*, 460 Mich 750, 762-765.

*Allen*, *8-9.

This decision was not contrary to, nor did it involve an unreasonable application of, clearly established Supreme Court law. Unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional violation. See *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Coy v. Renico*, 414 F. Supp. 2d 744, 756 (E.D. Mich. 2006). As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless

they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994).

Here, Petitioner cannot demonstrate that the admission of the DNA opinion evidence violated his federal constitutional rights or rendered his trial fundamentally unfair. Indeed, a federal district court cannot grant habeas relief on the admission of an expert witness's testimony in the absence of Supreme Court precedent showing that admission of that expert witness's testimony on a particular subject violates the federal constitution. See *Wilson v. Parker*, 515 F.3d 682, 705-706 (6th Cir. 2008). Petitioner has made no such showing. He cites no Supreme Court case concerning a constitutional right barring the admission of DNA opinion evidence of the type at issue here. Similarly, a determination as to whether an individual is qualified to give expert testimony involves only a state-law evidentiary issue. See *Vasquez-Torrez v. Dorsey*, 66 F.3d 339 [published in full-text format at 1995 U.S. App. LEXIS 25703], [WL] at *1 (10th Cir. 1995) (table).

Accordingly, Petitioner's first claim does not present a cognizable ground for granting habeas corpus relief.

C. Ineffective Assistance of Counsel - DNA Expert

Petitioner relatedly asserts that his counsel was ineffective for conceding to the skill of the DNA expert and for conceding that Petitioner's DNA was found on the

coat rather than attempting to challenge the accuracy of the testing or otherwise challenging the prosecution expert's conclusions.

To show that he was denied the effective assistance of counsel under federal constitutional standards, a defendant must satisfy a two prong test. First, the defendant must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In so doing, the defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *Id*. In other words, the defendant must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. *Strickland*, 466 U.S. at 689. Second, the defendant must show that such performance prejudiced his defense. *Id*. To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.[1]

At trial, the prosecutor's DNA expert, Lisa Champion, was qualified as an expert in DNA analysis without any objection from Petitioner's counsel. Dkt. 8-10, at 97. Champion testified that she followed standard lab procedures when conducting

---

[1] Contrary to Petitioner's allegations, a claim that counsel failed to perform a specific act during trial, as here, does not invoke a situation were prejudice may be presumed. See, e.g., *Florida v. Nixon*, 543 U.S. 175, 190 (2004).

her analysis, including processing positive and negative controls through every stage of the analysis to verify the accuracy of the tests. Id. at 102-03. Champion testified that she swabbed the cuff and collar area of the coat since those areas are the most likely to yield DNA results. Id. at 104. Champion then created a report detailing the DNA profile for the major donor for the coat, since no comparison sample existed yet. Id. at 108. After receiving a known sample from Petitioner, she compared the DNA profiles from the coat to the known sample. Id. at 108-110. Champion matched 14 of the 16 DNA marker locations. Id. at 110. Champion used the Polymerase Chain Reaction (PCR) testing method, which has been widely accepted by Michigan courts as reliable. See *People v. Lee*, 212 Mich. App. 228, 281-83 (1995).

Petitioner claims that his counsel should have done more to challenge Champion's testimony, but he offers nothing more than speculation that an attack on her analysis or conclusions would have made any weight for the defense. "It should go without saying that the absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'" *Burt v. Titlow*, 571 U.S. 12, 23 (2013)(quoting *Strickland*, 466 U.S. at 689).

Counsel cross-examined Champion when the prosecutor moved to qualify her as an expert, and he offered her a scenario whereby Petitioner's DNA may have been innocently transferred onto the coat if he merely handled it at the bar. Dkt. 8-

10, at 112-116. Champion could not conclusively rule-out such a transfer of genetic material. While counsel did not request or call an expert witness, he may have decided to avoid creating a "battle of expert witnesses," and instead focus on a possible innocent explanation for the presence of Petitioner's DNA on the coat. *Nields v. Bradshaw*, 482 F.3d 442, 456 (6th Cir. 2007) (decision to limit questioning of expert witness may have been a strategic one). Petitioner has failed to demonstrate on this record that his counsel was ineffective in the manner he dealt with the prosecutor's expert witness.

## D. Ineffective Assistance of Counsel - Additional Allegations

Petitioner's final claim asserts that his counsel erroneously allowed a police officer to testify that people at the bar denied owning the coat, that he erroneously allowed another officer to testify that he knew Petitioner from the officer's work in the narcotics unit, and that he allowed references to Petitioner being a parolee.

The Michigan Court of Appeals, after reciting the controlling constitutional standard for ineffective assistance of counsel claims, rejected the claim as follows:

> Defendant first argues that defense counsel was ineffective in failing to object to Ganzhorn's testimony that he went back into the bar and asked the patrons about the ownership of the coat, on the grounds that it was hearsay. Hearsay is defined as "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Further, "[t]he Confrontation Clause prohibits the admission of all out-of-court testimonial statements unless the declarant was unavailable at trial and the defendant had a prior opportunity for cross-examination." *People v. Chambers*, 277 Mich. App. 1, 10 (2007).

16

However, "a statement offered to show the effect of the out-of-court statement on the hearer does not violate the Confrontation Clause." *Id.* at 11. "Specifically, a statement offered to show why police officers acted as they did is not hearsay." *Id.*

Here, Ganzhorn's statements concerning actions he took on returning to the bar was not hearsay; however, Ganzhorn's testimony that "[e]veryone stated 'no.'" was hearsay not subject to any exception. Although the statement was made by Ganzhorn in response to the prosecution's open-ended question concerning his observations of the patrons of the bar, nonetheless the statement supported, at least by implication, the prosecution's claim that defendant possessed the coat. See *People v. Henry (After Remand)*, 305 Mich. App. 127, 154 (2014). Thus, defense counsel may have successfully objected to Ganzhorn's testimony. However "there are times when it is better not to object and draw attention to an improper comment." *People v. Horn*, 279 Mich. App. 31, 40 (2008)(quotation marks and citation omitted). Defense counsel may have believed that it was better not to draw attention to the fact that nobody else claimed the coat and that the other male in the bar indicated he had a coat. As defense counsel argued during closing arguments, someone who left his coat containing drugs at the bar probably would not want to stay near the coat or claim it. Defendant has failed to overcome the strong presumption that defense counsel's actions constituted sound trial strategy. *Id.*

Further, even if defense counsel's conduct was objectively unreasonable, defendant has failed to show the necessary prejudice. Defendant was within three feet of the coat when police arrived at the bar and defendant's DNA matched the DNA found on the coat. The coat was on the chair at the table where defendant's cellular telephone, eyeglasses, and beer were located. Defendant indicated that the cellular telephone was his. Moreover, defendant did not have a coat on, he denied that he had a coat, and it was a cold and snowy night. Additionally, the prosecution never made reference to Ganzhorn's isolated statement, instead focusing its closing argument on the fact that the coat was near other items belonging to defendant, the DNA testing, and that it was improbable that defendant would not have a coat on a snowy night in February. In light of the isolated nature of Ganzhorn's statement and the remaining evidence tying defendant to the coat, he has not established that there is "a reasonable probability

that the outcome would have been different but for" defense counsel's cross-examination of the detective. *Grant*, 470 Mich. at 486.

Defendant also argues that his defense counsel was ineffective for failing to request a limiting instruction in relation to his parole status. Prior to trial, the prosecutor explained that he planned on introducing the fact that defendant was on parole solely to explain the police contact at the bar. The prosecutor stated that he did not oppose a limiting instruction, but defendant did not request one. The decision whether to request a limiting instruction is a matter of trial strategy, which "this Court will not second-guess . . . with the benefit of hindsight." *People v. Rice (On Remand)*, 235 Mich. App. 429, 444-445 (1999). Here, defense counsel reasonably may not have wanted to re-emphasize the facts that defendant was on parole and that the police contact began because he violated his parole. Further, while it was not a limiting instruction, the prosecutor stated to the jury: "its [sic] very important, the issue of him being on parole and the Judge will instruct you on this, your [sic] not suppose[d] to hold against him the fact that he's on parole. It's only being offered to show why the Police had contact with him that day." Requesting a limiting instruction again would run the risk of re-emphasizing the matter. Defendant has not overcome the strong presumption that defense counsel's decision was sound trial strategy or demonstrated the necessary prejudice. *Id.*

Defendant also argues that defense counsel was ineffective in eliciting damaging testimony that Schuette knew of defendant. On cross-examination, defense counsel asked Schuette, an expert in street-level drug sales and dealing, how many cases he had worked on in the Jackson area, and Schuette testified that he had worked on thousands. Subsequently, defense counsel asked, "In all those thousands of cases, have you ever had contact or investigated or arrested [defendant]?" Schuette responded, "Yes," and the following exchange between defense counsel and Schuette took place:

Defense counsel: When was that?

Schuette: I don't know specifically but I have. I recognize him. I know his name, I know his nickname and I've heard them [sic].

Defense counsel: But you have no idea when you would have had contact with him?

Schuette: I'd be guessing.

Defense counsel: When I asked the question, I used multiple words there - contact, involvement and arrest. Do you remember what it was?

Schuette: What I recall is his name, his physical likeness, his physical appearance and his nickname. As you mention, there's been thousands. How that intertwines into the middle of that, I just cannot recall.

Defense counsel: So if [defendant] was to testify that he never remembers having any contact with you, could he be correct?

Schuette: Sure. If he doesn't remember, he could be correct.

Defense counsel: And your memory may stem from something other than an arrest. Is that correct?

Schuette: Yes.

Defense counsel: Other than direct involvement. Is that correct?

Schuette: It could.

Defense counsel: Other than specific contact with him. Is that correct?

Schuette: Yes, sir.

We can discern no strategic reason for defense counsel to embark on this line of questioning. It appears from the record that defense counsel, perhaps realizing the door he had opened, attempted to rehabilitate Schuette's testimony to limit the damage. Nonetheless,

even casting aside the benefit of hindsight, we cannot deem defense counsel's questions sound trial strategy. See *People v. Gioglio (On Remand)*, 296 Mich. App. 12, 22 (2012), vacated in part on other grounds 493 Mich. 86 (2012). Nonetheless, this was an isolated statement made by Schuette that was not referenced again by the prosecution. Further, Schuette only testified that he recognized defendant, not that he had arrested or suspected defendant of past crimes. In light of the other evidence against defendant, we do not find that defendant can demonstrate that Schuette's testimony was outcome determinative. *Grant*, 470 Mich. at 486.

*Allen*, \*5-7.

This decision did not result in an unreasonable application of clearly established Supreme Court law. With respect to allowing the hearsay statements that patrons of the bar said that the coat did not belong to them, the state appellate court acknowledged that the testimony was objectionable and could have been precluded. The court found, however, that defense counsel may have strategically decided not to object to avoid drawing attention to the testimony. The Court views this finding as a post-hoc rationalization.

Nevertheless, and as argued by defense counsel in closing, it is not surprising that no one at the bar wanted to claim ownership of a coat that contained a load of illegal drugs. The inference to be drawn from the hearsay was not that the coat must therefore have been Petitioner's, the logical inference is only that no one - not Petitioner and not anyone else at the bar - wanted to associate themselves with such incriminating evidence. The inadmissible testimony was thus not nearly as impactful as Petitioner alleges it was. The Court finds that there is no reasonable probability

that the result of the trial would have been different had counsel objected to the hearsay.

Petitioner next asserts that his counsel should have objected to a police officer's testimony that he knew Petitioner's name from his narcotics work. Again, the state appellate court noted that the testimony that Detective Schutte knew Petitioner through his work could have been avoided, but it found that Petitioner had not demonstrated *Strickland* prejudice. The Court agrees. Schutte did not testify that he had previously arrested Petitioner or even that Petitioner was known to him as a drug-dealer from prior contact. Rather, the exchange was fairly isolated. The officer merely testified that he was familiar with Petitioner's name in some forgotten capacity. In contrast, the evidence presented against Petitioner–as fairly outlined by the Michigan Court of Appeals–was rather strong. While defense counsel should have and could have avoided the testimony, it was not so prejudicial so as to merit relief.

Finally, Petitioner complains that his counsel allowed testimony that Petitioner was on parole at the time of the offense. But as the Michigan Court of Appeals correctly pointed out, this testimony was unavoidable. The circumstances of the offense arose because as a parolee, Petitioner was not supposed to be at a bar. It is the reason the police responded to the scene to locate Petitioner, and it explained their actions. As the state appellate court also noted, even the prosecutor in closing

argument stated to the jury that the fact Petitioner was a parolee should not be used against him. Again, Petitioner has not demonstrated *Strickland* prejudice for the manner in which his counsel dealt with this issue.

Accordingly, Petitioner's third habeas claim is without merit.

## IV. Conclusion

Before Petitioner may appeal this Court's dispositive decision, a certificate of appealability must issue. See 28 U.S.C. ' 2253(c)(1)(A); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. ' 2253(c)(2). When a court rejects a habeas claim on the merits, the substantial showing threshold is met if Petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. See *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying that standard, a district court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.* at 336-37. "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing ' 2254 Cases, Rule 11(a), 28 U.S.C. foll.' 2254.

Petitioner has not demonstrated a substantial showing of the denial of a constitutional right with respect to his claims. A reasonable jurists would not debate whether the Court correctly denied relief. Accordingly, a certificate of appealability will be denied.

The Court will, however, grant Petitioner permission to proceed on appeal in forma pauperis because an appeal could be taken in good faith. *See Foster v. Ludwick*, 208 F. Supp. 2d 750, 764 (E.D. Mich. 2002); 28 U.S.C. § 1915(a)(3); Fed. R.App.24 (a).

## V. Order

Accordingly, it is **ORDERED** that the petition for writ of habeas corpus is **DENIED**.

It is further **ORDERED** that a certificate of appealability is **DENIED**.

It is further **ORDERED** that Petitioner may proceed in forma pauperis on appeal.

s/Arthur J. Tarnow
Arthur J. Tarnow
Senior United States District Court

Dated: September 25, 2018